☑ Original                    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>4000 W. Burnham Street, Storage Unit 4215,<br>Milwaukee, WI 53215 | )<br>)<br>)   Case No.23-923M(NJ)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 5/10/23 _____ *(not to exceed 14 days)*
xx☐ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Nancy Joseph_____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for ___30___ days *(not to exceed 30)*      ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:4/26/2023 @ 4:30 p.m.

*Judge's signature*

City and state:      Milwaukee, WI                    Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**1666 S. Cesar Chavez Drive** is described as a cream brick service building garage. The building has a cream overhead garage door with a service door directly to the left of the overhead door. The numbers 1666 is affixed to a black mailbox that's attached to a 6 feet chain link fence. The chain link fence is in front of the business and directly behind is a driveway that's approximately 30 feet long.



**3627 W. Becher Street** is described as a single-family residence located on the south side of W. Becher Street.  The front of the residence consists of red asphalt brick siding, white trim, and cream siding. The roof consists of brown colored shingles.  There is a detached garage with cream color siding.  The numbers "3627" appear on a pillar in the front right side of the house which faces north.



**4000 W. Burnham Street, Storage Unit 4215** is described as a gray structure with a yellow roll-up garage door with the number "4215" displayed directly above the door.



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

A.  Fentanyl, cocaine, and any other controlled substance, packaging materials, devices, and materials used to prepare fentanyl, cocaine, and other controlled substances for distribution, controlled substances paraphernalia, and other contraband related to drug trafficking and distribution;

B.  Firearms including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, and any and all documentation related to the purchase of such items;

C.  Cash, currency, and financial instruments;

D.  All items related to the purchase of cryptocurrency, money orders, or other financial instruments, including receipts and invoices;

E.  Proceeds of narcotics offenses, including large amounts of United States currency, financial instruments, precious metals, jewelry, and other items of value, as well as books and records regarding the use, acquisition, and disposition of items of value;

F.  Documents related to the rental, lease, or ownership of property and/or storage units;

G.  Paraphernalia for packaging, processing, cutting, diluting, weighing, and distributing controlled substances, and for packaging cash drug proceeds, such as scales, funnels, heat sealing devices, plastic packaging, labels, stickers, presses, and money-counting devices;

H.  Documents related to rental, lease, or ownership of the search sites and other locations identified in the search warrant;

I.  Safe deposit box lease agreements and keys;

J.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances and individuals involved in that distribution;

K.  Firearms and any associated ammunition;

L.  Cellular phones, computers, and other electronic devices;

M.  Items that demonstrate use, ownership, access, or control of the Target Location or electronic devices located at the Target Location;

19

N.    With respect to any computer equipment or other electronic devices:

   1.    Passwords, encryption keys, and other equipment or devices that may be necessary to access and use the computer equipment;

   2.    Documents or other items demonstrating the presence or absence of computer software that would allow others to control the items, and presence or absence of security software designed to detect such malicious software;

   3.    Documents or other items demonstrating the attachment of other computer hardware or storage media;

   4.    Counter forensic programs and associated data that are designed to eliminate data;

   5.    Items in the paragraphs above that are stored in computer media, as well as media capable of being ready by a computer (such as external and internal computer hard drives, memory sticks and thumb drives) and electronic devices that are capable of analyzing, creating, displaying, converting, or transmitting electronic magnetic computer impulses or data.  These devices include but are not limited to computers, computer tablets, cellular telephones, computer components, external hard drives, thumb drives, media cards, and other computer-related electronic devices;

   6.    Any of the items described in the above paragraphs maintained in safes, desks, filing cabinets, or hidden compartments in the Target Location; and

   7.    Items in the paragraphs-above that are stored in electronic media, including media capable of being read by a computer (such as external and internal computer hard drives, memory sticks, CDs, and thumb drives), and electronic devices that are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data (such as, including but not limited to, cellular telephones and tablets).

O.    Records and items, including all communications (to include email records, text messages and hard copy correspondence) related to the generation of income, and regardless of whether such income was acquired lawfully or unlawfully, including but not limited to:

   1.    employment, regardless of whether such employment is documented through this issuance of an IRS Form W-2 or Form 1099;

   2.    the actual or attempted brokering, purchase, sale (or re-sale), or posting for sale of vehicles; and

   3.    Records related to the operation of any corporations, limited liability companies, partnerships, sole proprietorships, or other business-generating entity, including but not limited to the following entities:

20

       a.     Gomez Custom & Auto
       b.     Gomez Custom & Services Sonido & Iluminacion

P.    Financial records for individuals and entities, including but not limited to records that include or reference the following: receipts, checks, bank and savings and loan records of deposit, withdrawal and wire transfer, statements and other bank records, letters of credit, credit card statements and information, debit card statements and information, money orders, cashier's checks, passbooks, cancelled checks, certificates of deposit, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, and state and federal income tax returns;

Q.    Records and items, including all communications (to include email records, text messages and hard copy correspondence), related to the payment (or non-payment) of Federal, State, or local taxes by individuals and entities due and owing based upon the generation of income, including draft tax returns, payroll, and excise tax returns and other return-related information;

R.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies);

S.    Books, records, receipts, notes, ledgers, airline tickets, hotel receipts, money orders, and other papers relating to the distribution of controlled substances;

T.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances;

U.    Photographs of individuals, associates, their property, and their drugs; and

V.    Records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>4000 W. Burnham Street, Storage Unit 4215<br>Milwaukee, WI 53215 | )<br>)<br>)<br>)<br>)<br>)    Case No.23-923M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C. § 846 and<br>841 (a)(1), (b)(1)(B) | Conspiracy to Distribute, and Possess with the Intent to Distribute a Controlled<br>Substance, 500 grams or more of Cocaine |

The application is based on these facts:

Please see attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JEREMY S DORN    Digitally signed by JEREMY S DORN
Date: 2023.04.25 16:31:11 -05'00'

*Applicant's signature*

Jeremy S. Dorn, Special Agent - HSI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ TELEPHONE _____ *(specify reliable electronic means)*.

Date: 4/26/2023

*Judge's signature*

City and state: Milwaukee, WI      Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**

I, Jeremy Dorn, being duly sworn, depose and state as follows:

## I.     INTROCUTION AND AGENT BACKGROUND

1.     I am a Special Agent of the United States Department of Homeland Security, Homeland Security Investigations (HSI), assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I have been a federal law enforcement agent for over ten years.  I have received basic criminal investigative training, including thirty-six weeks at the Federal Law Enforcement Training Center (FLETC).  In the course of my work, I have become knowledgeable in the enforcement of federal laws pertaining to narcotics and dangerous drugs. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2.     I have participated in drug trafficking investigations conducted by HSI, the Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), the United States Postal Service (USPS), and other law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances.  I am currently a member of the North Central High Intensity Drug Trafficking Area (HIDTA) Task Force assigned to the opioid initiative as an investigator specializing in the smuggling, trafficking, and distribution of dangerous and controlled substances.  I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances.  I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers.

3.     I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of federal statutes, including narcotics and money laundering.  These warrants involved the search of locations including: residences of targets, their associates, and relatives, "stash houses"

1

(houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence, searched for, and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

4. Through training, experience, and discussions with other experienced agents;

a. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, methamphetamine, cocaine, and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d. I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required in order to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

g. I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug

2

traffickers. These secure locations include, but are not limited to, safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses, or other locations over which they maintain dominion and control;

j. I know large-scale drug traffickers often use electronic equipment such as telephones (landlines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, cryptocurrency exchanges or off-exchange cryptocurrency storage locations or devices, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

l. I know drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

m. I know drug traffickers take or cause to be taken photographs of themselves; their associates, their property, and their drugs. These traffickers usually maintain these photographs in their possession.

n. I know drug traffickers and money launderers who amass the proceeds of their enterprise quite often secure their money within secure locations within their dominion and control, often in their residences, businesses, and storage facilities, and often in safes or other secure containers, such as safety deposit boxes;

o. I know large-scale drug trafficking and money laundering activities require the cooperation, association, and communication between and among a number of people within the organization. As a result, people who traffic in controlled substances or launder money for such organizations will possess documents that identify other members of their organization, such as telephone books, address books, handwritten notations,

3

telephone bills, gambling ledgers, and documents containing lists of names and addresses of criminal associates;

p.    I know individuals attempting to conceal their illegal activities will frequently place assets obtained with proceeds of criminal activity in the names of friends, relatives, trusted associates, or fictitious entities to avoid detection of these assets by the Internal Revenue Service and other government agencies. Even though these assets are in the names of others, the true owners will continue to exercise dominion and control over the use, ownership, and disposition of these assets;

q.    I know individuals attempting to conceal their illegal activities or otherwise involved in illegal activities will often purchase gifts or transfer cash and other assets to family members and friends in order to conceal the source of the funds or to otherwise launder the proceeds;

r.    I know individuals involved in illegal activities will utilize checking and savings accounts or safety deposit boxes at financial institutions in the names of relatives, friends, trusted associates, or fictitious business entities. These relatives and associates also conduct financial transactions on the individuals' behalf utilizing monetary instruments, including wire transfers of monies into foreign accounts outside the United States;

s.    I know individuals involved in illegal activities will frequently have some sort of legitimate income or funds and comingle their criminal profits with their legitimate funds. This helps conceal the illegal source. Monetary instruments can then be acquired against the funds in the account, or a check can simply be written on the account without creating any Currency Transaction Reports (CTRs) or Suspicious Activity Reports (SARs);

t.    I know individuals involved in illegal activities will frequently allow third parties and/or co-conspirators to make cash deposits to their bank accounts. An individual depositing currency is not always required to show identification to banking officials, therefore, a third party can go to a bank branch anywhere in the U.S. and deposit cash to an account that is not held in their name. Because the funds are deposited in cash, the account holder, who can be in a different State, can then go to their local bank branch and immediately withdraw the funds in cash. This method of transferring money provides for an almost instantaneous transfer of funds that could not be achieved through the shipping of bulk currency via common carrier and maintains the virtual anonymity of the third party making the deposit which would not be possible if transferring money through a wire service business such as Money Gram or Western Union;

u.    I know individuals who are attempting to conceal their illegal activities from the IRS and other government agencies commonly hide records that will establish their true ownership of assets. Such records typically include: bank statements, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, automobile titles, property deeds, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices; and

4

v.     I know individuals who seek to hide such records typically keep those records in a place that is secure but easily accessible, such as their personal residences, garages, automobiles, storage facilities, safety deposit boxes, briefcases, purses, and safes or security storage containers.

5.     In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

6.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations set forth above in paragraph (2) occurred and that probable cause exists to believe that locations described in Attachment A, incorporated herein by reference, contain the items that are described in Attachment B. All times are approximate.

## II.    LOCATION FOR WHICH SEARCH WARRANTS ARE SOUGHT

7.     The target location listed below is in the Eastern District of Wisconsin, and more particularly described in Attachment A and Attachment B:

a.    **1666 S. Cesar Chavez Drive, Milwaukee, Wisconsin 53215.**

b.    **3627 W. Becher Street, Milwaukee, Wisconsin 53215.**

c.    **4000 W. Burnham Street, Storage Unit 4215, Milwaukee, WI 53215**

## III.    BACKGROUND AND SUMMARY OF THE INVESTIGATION

8.     The United States, including the Drug Enforcement Administration, Milwaukee Police Department, members of the North Central High Intensity Drug Trafficking Area (HIDTA) and Homeland

5

Security Investigations have been conducting a criminal investigation into cocaine distribution by the Jose GOMEZ-IBARRA Drug Trafficking Organization, hereinafter referred to as the "GOMEZ-IBARRA DTO." I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable;[1] and (b) financial records obtained via subpoena. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all my knowledge about this matter.

9.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 and 841 (conspiracy to manufacture, distribute, and possess with the intent to distribute a controlled substance, distribution of a controlled substance, and possession with intent to distribute a controlled substance), have been committed, are being committed, and will be committed by Jose GOMEZ-IBARRA, Juan ROMO and others not yet identified.

## IV.     PROBABLE CAUSE

10.     In December 2021, case agents met with a confidential source, hereinafter referred to as "CS-1."[2]   CS-1 provided information regarding a car club called Nokturnal that is involved in drug trafficking in the Milwaukee, Wisconsin, area. CS-1 identified Jose Guadalupe GOMEZ-IBARRA (aka "Lupillo") as one of the larger cocaine traffickers in this group, selling kilogram quantities of cocaine and other controlled substances, such as methamphetamine and fentanyl pills in the Milwaukee area. CS-1 stated GOMEZ-IBARRA told CS-1 to contact him/her through GOMEZ-IBARRA's Facebook account (Lupillo Gomez) if CS-1 wanted to be supplied with cocaine.

---

[1] Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

[2] Case agents believe CS-1 is a reliable person because CS-1 has provided information which law enforcement has been able to corroborate through independent investigation, CS-1 has provided statements against CS-1's own penal interests, and CS-1 has conducted controlled buys of narcotics for law enforcement.  CS-1's has no criminal history.  CS-1 is cooperating in exchange for consideration on a pending felony arrest.  Criminal charges were subsequently declined based on CS-1's cooperation.

6

11.     CS-1 identified GOMEZ-IBARRA's residence as a single-family residence at 3627 W. Becher Street, Milwaukee, Wisconsin, and his place of business called Gomez Custom & Auto Services at 1666 S Cesar E. Chavez Drive, Milwaukee, Wisconsin.

### Bulk-Cash Smuggling Event Associated with Targets in Milwaukee, WI

12.     On June 3, 2020, Caitlyn Leann KELLY was traveling from the United States to Mexico via the Gateway International Bridge in Brownsville, Texas. Kelly was the driver and sole occupant of a white 2012 Volkswagen sedan displaying Texas license plate MYJ-0217. Customs and Border Protection Officers at the Port of Entry were conducting outbound operations and encountered KELLY, which resulted in the seizure of 13 individually packaged bundles of bulk U.S. currency with an aggregate total of $70,050. Homeland Security Investigations (HSI) Border Enforcement Security Taskforce (BEST) responded and adopted the case for federal prosecution.

### Synopsis of Post-Miranda Statements Made by Caitlyn KELLY

13.     KELLY stated to HSI Special Agents (SA) that she was travelling to Mexico to purchase contacts and to drop off the 2012 Volkswagen sedan to unknown persons for her mother in-law, Carmen CERVANTES. KELLY admitted she was going to leave the car with the keys in it at a parking lot of a shopping center named Sorianos. KELLY said her fiancé, Damian TREVINO, was travelling in tandem with her and driving KELLY's Toyota RAV 4. TREVINO was travelling with another male identified by agents as Miguel GOMEZ. KELLY admitted that in addition to travelling to Mexico with GOMEZ, she also travelled to Chicago, IL, and Milwaukee, WI with TREVINO, and GOMEZ.

14.     KELLY positively identified a subject known to her and identified by agents as Carmen CERVANTES. KELLY stated CERVANTES is the mother of her ex-fiancé and main coordinator as it pertained to the movement of illegal drugs and bulk U.S. currency. KELLY further explained that TREVINO was the principal transporter of contraband and bulk U.S. currency at the direction of CERVANTES.

7

15.     KELLY identified a subject that KELLY claims not to know but described him as the guy with one leg.  This subject was identified by agents as Miguel Angel GOMEZ.  KELLY said GOMEZ would accompany TREVINO and KELLY on trips to Milwaukee, WI and Matamoros, Tamaulipas, Mexico.  KELLY described GOMEZ as the mechanic and was responsible for removing and placing contraband in after-market compartments.

16.     KELLY admitted the purpose of the trip to Matamoros was so that CERVANTES could meet with unknown co-conspirators involved in the smuggling of illegal drugs from Mexico into the United States.  KELLY admitted CERVANTES was overseeing TREVINO and GOMEZ as they smuggled drugs from Mexico into the U.S. and subsequently transported the drugs north into the interior of the U.S. KELLY added that prior to her involvement, she was made aware that they were responsible for transporting the drugs north and then having bulk U.S. currency placed into the same vehicle so that it could be smuggled back into Mexico as payment.

17.     KELLY conceded that the Volkswagen she had been operating on the day of her arrest, was in fact the vehicle used to secrete contraband destined to Milwaukee and Houston.  KELLY was presented with text messages from her consensually searched cell phone and corroborated that some messages indicated knowledge of the delivery of contraband to Milwaukee.  KELLY stated she made a trip to Milwaukee with TREVINO and GOMEZ and provided an address of 3627 W. Becher Street, Milwaukee, WI.  KELLY noted that she had to drive for a significant portion of the trip because TREVINO and GOMEZ were high on cocaine and the purpose of the trip was to remove what KELLY believed to be cocaine secreted in the vehicle.

18.     KELLY said GOMEZ would remove the drugs from the engine compartment since he was a mechanic, while TREVINO would utilize the kitchen inside the residence to wrap bulk U.S. currency to secrete in the compartment of the 2012 Volkswagen.  Agents determined property records revealed the owner of 3627 W. Becher Street is Roberto GOMEZ-Ibarra.

8

19.     HSI Brownsville Special Agents received latent print analysis on or about June 23, 2020. As part of the analysis, agents were able to establish Jesus COLLAZO was found to be an alias for a subject further identified as Jose Guadalupe GOMEZ-Ibarra, who is illegally present in the United States and living in Milwaukee, WI.

### Synopsis of Post-Miranda Statements Made by Miguel GOMEZ

20.     GOMEZ stated Jose GOMEZ-IBARRA is responsible for receiving cocaine and turning over bulk-cash in Milwaukee, WI and 3627 W. Becher Street, Milwaukee, WI is the residence receiving cocaine and supplying illicit bulk-cash for transportation to Mexico.

21.     GOMEZ admitted to making approximately three to four trips with TREVINO from Mexico to Milwaukee, WI.  GOMEZ noted the vehicle was used to smuggle what he believed to be cocaine, using the same compartment used to conceal the bulk U.S. currency. GOMEZ stated his job was to count, package, and vacuum-seal currency.  Once the drugs were removed from the compartment, they would be replaced with bulk-cash.  GOMEZ stated that he was aware that cocaine was inside the hidden compartment in the Volkswagen.  GOMEZ said that once in Milwaukee, they would turn the vehicle over to a subject known to GOMEZ as Lupillo GOMEZ.  Agents showed GOMEZ a photo lineup and GOMEZ positively identified Jose Guadalupe GOMEZ-IBARRA as Lupillo and stated 3627 W. Becher Street in Milwaukee was the residence where GOMEZ would meet Lupillo.

22.     MIGUEL GOMEZ and Caitlyn KELLY have been indicted in the southern District of Texas and are pending judicial proceedings.

### Controlled Purchases of Drugs from Jose GOMEZ-IBARRA

#### July 25, 2022, Controlled Purchase of Cocaine

23.     On July 20, 2022, CS-1 informed case agents that "Lupillo" agreed to meet on Monday, July 25, 2022, at Lupillo's place of business, located at 1666 S. Cesar Chavez Drive, Milwaukee, WI 53215, to purchase two ounces of cocaine for $1,600.00.

9

24.     On July 25, 2022, at 9:48 a.m., CS-1 sent a message to GOMEZ-IBARRA through Facebook, in Spanish, saying that CS-1 needed "two radios" (code word for two ounces of cocaine). CS-1 goes on to tell GOMEZ-IBARRA that CS-1 went to work for a little while and would meet with him around 1:00 p.m. GOMEZ-IBARRA responded, "Ok, let me know. I'll be here." At 12:53 p.m., CS-1 sent a message to GOMEZ-IBARRA through Facebook asking where CS-1 should meet him. GOMEZ-IBARRA responded, "Garage."

25.     Case agents provided CS-1 with $1,600.00 in pre-recorded buy money. CS-1 was also provided with an audio/video recording device. Case agents followed CS-1 to GOMEZ-IBARRA's garage, at 1666 S Cesar Chavez Drive, Milwaukee, WI.

26.     At 1:24 p.m., case agents observed CS-1 parking on Cesar Chavez Drive, in front of the garage. CS-1 stepped out of the vehicle, walked up to the garage, and knocked on the garage door. It appeared that no one answered at the garage and CS-1 walked back to CS-1's vehicle.

27.     GOMEZ-IBARRA was spotted at NAPA's Auto Parts, located at 1425 W. Burnham Street, which is near GOMEZ-IBARRA's place of business. At 1:35 p.m., GOMEZ-IBARRA was observed driving his black Escalade (Wisconsin registration plate AJV8448), from Napa's Auto Parts to the garage, where he met CS-1.

28.     At 1:36 p.m., case agents observed CS-1 step out of the vehicle and walk up to GOMEZ-IBARRA who was getting out of the black Escalade. At 1:38 p.m., CS-1 and GOMEZ-IBARRA walked inside of the garage. At 1:41p.m., CS-1 and GOMEZ-IBARRA were observed walking out of the garage. CS-1 walked back into CS-1's vehicle and drove away.

29.     CS-1 was followed to the predetermined meet location and handed case agents the suspected cocaine and the recording device. CS-1 related when CS-1 arrived at the garage, CS-1 knocked on the garage door and received no answer. CS-1 sent a message on Facebook messenger and informed GOMEZ-IBARRA that CS-1 was at location. GOMEZ-IBARRA replied that he was two minutes away.

10

When GOMEZ-IBARRA arrived, they walked into the garage. CS-1 handed GOMEZ-IBARRA the prerecorded buy money, and GOMEZ-IBARRA walked into an office area, walked back, and handed the suspected cocaine to CS-1. CS-1 stated GOMEZ-IBARRA offered a kilogram of cocaine for $24,000. CS-1 stated they both walked out of the garage together because GOMEZ-IBARRA needed to go purchase a car part. The substance field-tested positive for the properties of cocaine with a total weight of 54.86 grams.

*October 12, 2022, Controlled Purchase of Cocaine*

30. On October 3, 2022, at 10:44 a.m., and at 10:51 a.m., CS-1 attempted to place a call to GOMEZ-IBARRA's Facebook account, however, GOMEZ-IBARRA did not answer the calls and replied with a message in Spanish saying, " Tell me" (Digame). The CS-1 replied in Spanish, "I needed two, but you did not answer, I already left to work, tomorrow I'll pass by for two boxes" (Ocupaba dos pero no contestaste ya me vine a trabajar manana paso por dos cajas). CS-1 and GOMEZ-IBARRA did not complete this transaction.

31. On October 12, 2022, at 1:13 p.m., CS-1 sent a message to GOMEZ-IBARRA's Facebook account. CS-1 sent a message in Spanish saying, "Compa" (friend/buddy). GOMEZ-IBARRA replied, "Tell me" (Digame). CS-1 responded, "I want to pass by for two (Queria pasar por dos). Case agents are aware that "pass by for two" meant to go to his place of business (1666 S. Cesar Chaves Drive) to purchase two ounces of cocaine. At 1:35 p.m., CS-1 placed a recorded call to GOMEZ-IBARRA's Facebook account. GOMEZ-IBARRA answered the call and instructed CS-1 to go to the garage.

32. Case agents provided CS-1 with $1,600.00 and an audio/video recording device. Case agents followed CS-1 to GOMEZ-IBARRA garage, which is located at 1666 S. Cesar Chavez Drive, Milwaukee, WI. Case agents established surveillance near GOMEZ-IBARRA's place of business.

33. At 1:57 p.m., case agents observed CS-1 parking directly in front of the garage on S. Cesar Chavez Drive. CS-1 stepped out of the vehicle, walked up to the garage, and knocked at the service door.

11

At 1:58 p.m., the door opened, and CS-1 was observed walking into the garage. At 2:04 p.m., CS-1 walked out of the garage, returned to CS-1's vehicle and drove off.

34.     CS-1 was followed to a pre-determined meet location and handed case agents the suspected cocaine and the recording device. CS-1 related when CS-1 knocked on the garage door GOMEZ-IBARRA answered. CS-1 and GOMEZ-IBARRA walked into an office area where CS-1 handed the $1600.00 to GOMEZ-IBARRA. GOMEZ-IBARRA opened a top desk drawer and pulled out what CS-1 estimated to be one-half kilograms of cocaine. GOMEZ-IBARRA broke off a chunk, weighed it on a scale, placed it inside a plastic baggie and handed it to CS-1. The substance later field-tested positive for properties of cocaine with a total weight of 56.06 grams.

*November 22, 2022, Controlled Purchase of Cocaine*

35.     On November 22, 2022, at 11:16 a.m., CS-1 attempted to place a call to Jose GOMEZ-IBARRA's Facebook account, however, GOMEZ-IBARRA did not answer the call. CS-1 sent a message in Spanish, "What's up son (Que onda hijo) I wanted to pass by for two oranges" (Queria pasar por dos naranjas). Jose GOMEZ-IBARRA replied, "Pass by at 1" (A la 1 pasas). CS-1 replied, "Can you do it before one because I'm leaving for work" (No puedes antes de la una por que me iva ir a trabajar.)

36.     At 1:29 p.m., CS-1 sent another message to GOMEZ-IBARRA's Facebook account asking where GOMEZ-IBARRA was at. GOMEZ-IBARRA replied at 1:51 p.m. saying, "Here at the garage" (Aki en el taller). CS-1 responded at 2:01 p.m., "Ok, on my way" (Ok hay voi).

37.     Case agents provided CS-1 with $1,600.00 and an audio/video recording device. Case agents followed CS-1 to GOMEZ-IBARRA garage, which is located at 1666 S. Cesar Chavez Drive, Milwaukee, WI. Case agents established surveillance near GOMEZ-IBARRA's place of business.

38.     At 2:17 p.m., case agents observed CS-1 park directly in front of the garage on S. Cesar Chavez Drive. CS-1 stepped out of the vehicle, walked up to the garage, and knocked at the service door.

12

39.     At 2:18 p.m., case agents observed the service door open, and CS-1 walk in. At 2:23 p.m., case agents observed CS-1 walk out of the garage and return to CS-1's vehicle and drives off. CS-1 was followed to a pre-determined meet location. CS-1 handed case agents with the suspected cocaine and the recording device. CS-1 related the circumstances of the transaction. CS-1 knocked on the garage door and was met by GOMEZ-IBARRA. CS-1 noticed a mechanic working on a vehicle inside of the garage. CS-1 and GOMEZ-IBARRA walked into an office area where CS-1 handed the $1,600.00 to GOMEZ-IBARRA. GOMEZ-IBARRA opened a top cabinet and pulled out the suspected cocaine and handed it to CS-1. The substance later field-tested positive for cocaine with a total weight of 55.45 grams.

*January 26, 2023, Controlled Purchase of Cocaine*

40.     On January 25, 2023, at 6:04 p.m., CS-1 sent a message to GOMEZ-IBARRA's Facebook account stating, "I'll stop by tomorrow for the two oranges" (Paso manana por dos naranjas). GOMEZ-IBARRA replied, "Ok." CS-1 asked at what time and GOMEZ-IBARRA replied after 1:00 p.m.

41.     On January 26, 2023, at 10:45 a.m., GOMEZ-IBARRA sent a message from his Facebook account stating, "Good morning" (Buenos Dias). At 11:22 a.m., CS-1 replied, "What's the word Buddy" (Que Dice Compa). CS-1 told GOMEZ-IBARRA that CS-1 would stop by later. At 12:37 p.m. GOMEZ-IBARRA sent a message asking, are you coming at 1(Si vas a llegar a las 1). GOMEZ-IBARRA sent a follow-up message saying, "Look I'll wait for you at my house at 1" (Mira te espero en mi casa a la 1). At 1:19 p.m., CS-1 placed a recorded call to GOMEZ-IBARRA's Facebook account. CS-1 told GOMEZ-IBARRA that CS-1 was on the way to GOMEZ-IBARRA.

42.     Case agents provided CS-1 with $1,600.00 and an audio/video recording device. Case agents followed CS-1 to GOMEZ-IBARRA's residence, which is located at 3627 W. Becher St, Milwaukee, WI. Case agents established surveillance near GOMEZ-IBARRA's residence.

43.     At 1:43 p.m., case agent observed CS-1 parking west of GOMEZ-IBARRA's residence on W. Becher Street CS-1 stepped out of the vehicle, walked up to the side door of the residence, and 13

knocked. At 1:45 p.m., case agent observed CS-1 walk into the side door of the residence. At 1:49 p.m., case agents observed CS-1 walk out the side door of the residence and return to CS-1's vehicle.

44.    CS-1 was followed to a pre-determined meet location. CS-1 handed case agents the suspected cocaine and the recording device. CS-1 related the circumstances of the transaction. CS-1 knocked on the side door of the residence and was met by GOMEZ-IBARRA. CS-1 and GOMEZ-IBARRA walked downstairs to the basement where GOMEZ-IBARRA pulled out the suspected cocaine from his pocket and handed it to CS-1. CS-1 then handed $1600.00 to GOMEZ-IBARRA. The substance later field-tested positive for properties of cocaine with a total weight of 55.07 grams.

*Anticipated April 27, 2023, Controlled Purchase of Cocaine*

45.    On April 19, 2023,  CS-1 placed a recorded call to GOMEZ IBARRA's  Facebook account. GOMEZ-IBARRA answered the call and told CS-1 he had to leave and was no longer at the garage. CS-1 asked GOMEZ-IBARRA how much it would be for the "big ones" if CS-1 grabbed two (2 kilograms of cocaine).  GOMEZ-IBARRA responded that right now "it's on 22nd Street" ($22,000 per kilogram).  CS-1 asked if that's the least GOMEZ-IBARRA would do and GOMEZ-IBARRA  replied, "Yes, right now." CS-1 attempted to negotiate the price of cocaine, and asked if GOMEZ-IBARRA would sell it for 20 ($20,000 per kilogram of cocaine). GOMEZ-IBARRA said no. CS-1 tried to continue to negotiate for a lesser price and GOMEZ-IBARRA asked if CS-1 has it all (money).  CS-1 said yes and asked again what is the lowest price GOMEZ-IBARRA could do.  GOMEZ-IBARRA said 21 ($21,000 per kilogram of cocaine).

46.    On April 24, 2023,  CS-1 placed a recorded call to GOMEZ IBARRA's  Facebook account. GOMEZ-IBARRA answered the call and CS-1 told GOMEZ-IBARRA that CS-1 was still interested in purchasing the two kilograms of cocaine but that the deal would have to wait until later in the week.

**GOMEZ-IBARRA's Storage Unit**

47.     In March 2022, case agents obtained a state of Wisconsin court-order authorizing the use of a Global Positioning System (GPS) device for a black Cadillac (WI/AJV8448 and VIN: 1GYFK63877R394878) known to be operated by GOMEZ-IBARRA. The black Cadillac Escalade was registered to Miguel GOMEZ at 3627 W. Becher Street, Milwaukee, WI (the residence of GOMEZ-IBARRA).   During the recorded GPS tracking period of approximately April 4, 2022, to September 20, 2022, the GPS indicated the black Cadillac Escalade was at Stadium Self-Storage, 4000 W. Burnham Street, Milwaukee, WI 53215, approximately 23 times.   According to Stadium Self-Storage business rental roll, GOMEZ-IBARRA began renting storage unit 4215 in May of 2021 and the next payment is due April 30, 2023, indicating the account and rental of the storage unit is active.

48.     Based on my training and experience, I know it is common for larger-scale drug traffickers to rent storage units to store narcotics, illicit proceeds from the sale of narcotics, drug trafficking ledgers and records, and guns.  Case agents believe GOMEZ-IBARRA is using Stadium Self-Storage in such a capacity and to further his drug trafficking activities.

**CONCLUSION**

49.     Based on the facts contained within this affidavit, I believe that probable cause exists to believe that in the Eastern District of Wisconsin, and elsewhere Jose G GOMEZ-IBARRA and others:

  a.   Knowingly conspired with each other, and others known and unknown, to possess with the intent to distribute and distribute in excess of 500 grams of cocaine, Schedule II controlled substances, all in violation of Title 21, United States Code, Sections 841 (a)(1), 841(b)(1)(B), and 846; and

  b.   Knowingly and intentionally used a communication facility, to wit, a telephone, in facilitating the commission of any act or acts constituting a felony under Title 21, United States Code, Section 841(a)(1).  All in violation of Title 21, United States Code, Section 843(b).

  c.   Knowingly conspired with each other, and others known and unknown, to commit offenses against the United States in violation of Title 18, United States Code, Section

1956 and Section 1957, namely: to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, distribution of controlled substances, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Sections , 1956(a)(1)(B)(i) and 856 (h).

50.    Based on the facts contained within this affidavit, I further believe that probable cause exists to believe that evidence of the offenses described above will be found in:  1666 S. Cesar Chavez Drive, Milwaukee, Wisconsin, to include all associated vehicles parked on the premises; Storage unit 4215 at Stadium Self-Storage, located at 4000 W. Burnham Street, Milwaukee, WI and at Jose GOMEZ-IBARRA's residence at 3627 W. Becher Street, Milwaukee, Wisconsin, to include the garage, all vehicles parked on premises and outbuildings.

16

**1666 S. Cesar Chavez Drive** is described as a cream brick service building garage. The building has a cream overhead garage door with a service door directly to the left of the overhead door. The numbers 1666 is affixed to a black mailbox that's attached to a 6 feet chain link fence. The chain link fence is in front of the business and directly behind is a driveway that's approximately 30 feet long.



**3627 W. Becher Street** is described as a single-family residence located on the south side of W. Becher Street. The front of the residence consists of red asphalt brick siding, white trim, and cream siding. The roof consists of brown colored shingles. There is a detached garage with cream color siding. The numbers "3627" appear on a pillar in the front right side of the house which faces north.



17

**4000 W. Burnham Street, Storage Unit 4215** is described as a gray structure with a yellow roll-up garage door with the number "4215" displayed directly above the door.



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

A.  Fentanyl, cocaine, and any other controlled substance, packaging materials, devices, and materials used to prepare fentanyl, cocaine, and other controlled substances for distribution, controlled substances paraphernalia, and other contraband related to drug trafficking and distribution;

B.  Firearms including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, and any and all documentation related to the purchase of such items;

C.  Cash, currency, and financial instruments;

D.  All items related to the purchase of cryptocurrency, money orders, or other financial instruments, including receipts and invoices;

E.  Proceeds of narcotics offenses, including large amounts of United States currency, financial instruments, precious metals, jewelry, and other items of value, as well as books and records regarding the use, acquisition, and disposition of items of value;

F.  Documents related to the rental, lease, or ownership of property and/or storage units;

G.  Paraphernalia for packaging, processing, cutting, diluting, weighing, and distributing controlled substances, and for packaging cash drug proceeds, such as scales, funnels, heat sealing devices, plastic packaging, labels, stickers, presses, and money-counting devices;

H.  Documents related to rental, lease, or ownership of the search sites and other locations identified in the search warrant;

I.  Safe deposit box lease agreements and keys;

J.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances and individuals involved in that distribution;

K.  Firearms and any associated ammunition;

L.  Cellular phones, computers, and other electronic devices;

M.  Items that demonstrate use, ownership, access, or control of the Target Location or electronic devices located at the Target Location;

19

N.    With respect to any computer equipment or other electronic devices:

1.    Passwords, encryption keys, and other equipment or devices that may be necessary to access and use the computer equipment;

2.    Documents or other items demonstrating the presence or absence of computer software that would allow others to control the items, and presence or absence of security software designed to detect such malicious software;

3.    Documents or other items demonstrating the attachment of other computer hardware or storage media;

4.    Counter forensic programs and associated data that are designed to eliminate data;

5.    Items in the paragraphs above that are stored in computer media, as well as media capable of being ready by a computer (such as external and internal computer hard drives, memory sticks and thumb drives) and electronic devices that are capable of analyzing, creating, displaying, converting, or transmitting electronic magnetic computer impulses or data.  These devices include but are not limited to computers, computer tablets, cellular telephones, computer components, external hard drives, thumb drives, media cards, and other computer-related electronic devices;

6.    Any of the items described in the above paragraphs maintained in safes, desks, filing cabinets, or hidden compartments in the Target Location; and

7.    Items in the paragraphs-above that are stored in electronic media, including media capable of being read by a computer (such as external and internal computer hard drives, memory sticks, CDs, and thumb drives), and electronic devices that are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data (such as, including but not limited to, cellular telephones and tablets).

O.    Records and items, including all communications (to include email records, text messages and hard copy correspondence) related to the generation of income, and regardless of whether such income was acquired lawfully or unlawfully, including but not limited to:

1.    employment, regardless of whether such employment is documented through this issuance of an IRS Form W-2 or Form 1099;

2.    the actual or attempted brokering, purchase, sale (or re-sale), or posting for sale of vehicles; and

3.    Records related to the operation of any corporations, limited liability companies, partnerships, sole proprietorships, or other business-generating entity, including but not limited to the following entities:

   a.  Gomez Custom & Auto
   b.  Gomez Custom & Services Sonido & Iluminacion

P. Financial records for individuals and entities, including but not limited to records that include or reference the following: receipts, checks, bank and savings and loan records of deposit, withdrawal and wire transfer, statements and other bank records, letters of credit, credit card statements and information, debit card statements and information, money orders, cashier's checks, passbooks, cancelled checks, certificates of deposit, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, and state and federal income tax returns;

Q. Records and items, including all communications (to include email records, text messages and hard copy correspondence), related to the payment (or non-payment) of Federal, State, or local taxes by individuals and entities due and owing based upon the generation of income, including draft tax returns, payroll, and excise tax returns and other return-related information;

R. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies);

S. Books, records, receipts, notes, ledgers, airline tickets, hotel receipts, money orders, and other papers relating to the distribution of controlled substances;

T. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances;

U. Photographs of individuals, associates, their property, and their drugs; and

V. Records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates.